# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
Filed: December 21, 2020

| | | |
|---|---|---|
| * * * * * * * * * * * * * * * * * * * * | | |
| KAVITA DESAI, | * | UNPUBLISHED |
| | * | |
| | * | No. 14-811V |
| Petitioner, | * | |
| v. | * | Special Master Gowen |
| | * | |
| | * | Ruling on Damages; Influenza |
| SECRETARY OF HEALTH | * | (Flu) Vaccine; Shoulder Injury |
| AND HUMAN SERVICES, | * | Related to Vaccine Administration |
| | * | (SIRVA). |
| Respondent. | * | |
| * * * * * * * * * * * * * * * * * * * * | | |

*Richard Gage,* Richard Gage, P.C., Cheyenne, WY, for petitioner.
*Camille M. Collett,* Department of Justice, Washington, D.C., for respondent.

## RULING ON DAMAGES[1]

On September 4, 2014, Kavita Desai ("petitioner"), filed a petitioner for compensation under the National Vaccine Injury Compensation Program.[2] Petitioner alleges that she suffered a right shoulder injury related to vaccine administration ("SIRVA") as a result of receiving an influenza ("flu) vaccination on November 15, 2012. Petition at Preamble. (ECF No. 1). On July 30, 2020, I issued a Ruling on Entitlement, finding petitioner entitled to compensation.

After a full review of all the evidence and testimony presented at the entitlement and damages hearing, I find the petitioner is entitled to an award of damages in the amount of

---

[1] Pursuant to the E-Government Act of 2002, *see* 44 U.S.C. § 3501 note (2012), because this opinion contains a reasoned explanation for the action in this case, I am required to post it on the website of the United States Court of Federal Claims. The court's website is at http://www.uscfc.uscourts.gov/aggregator/sources/7. **This means the opinion will be available to anyone with access to the Internet.** Before the opinion is posted on the court's website, each party has 14 days to file a motion requesting redaction "of any information furnished by that party: (1) that is a trade secret or commercial or financial in substance and is privileged or confidential; or (2) that includes medical files or similar files, the disclosure of which would constitute a clearly unwarranted invasion of privacy." Vaccine Rule 18(b). An objecting party must provide the court with a proposed redacted version of the opinion. *Id.* **If neither party files a motion for redaction within 14 days, the opinion will be posted on the court's website without any changes.** *Id.*

[2] The National Vaccine Injury Compensation Program is set forth in Part 2 of the National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755, codified as amended 42 U.S.C. §§ 300aa-10 to 34 (2012) (hereinafter "Vaccine Act" or "the Act"). Hereinafter, individual section references will be to 42 U.S.C. § 300aa of the Act.

1

$125,000.00 for past pain and suffering, $1,772.60 for past unreimbursable medical expenses and $1,000 per year for her life expectancy of thirty years for future pain and suffering and $60,886.60for life care plan items including physical therapy.  The latter two damages to be reduced to present value.

### I. Relevant Procedural History

The procedural history of this case was summarized in the Ruling on Entitlement, issued on July 30, 2020.  The procedural history from that ruling is incorporated in its entirety and will not be repeated here.

### II.  Relevant Factual History

The factual history in this case was detailed extensively in the Ruling on Entitlement. *See* Entitlement Ruling. The facts discussed below are relevant to petitioner's damages.

The petitioner was born on November 23, 1964, and received a flu vaccination in her right, dominant arm on November 15, 2012.  Petitioner's Exhibit ("Pet. Ex.")1.  Petitioner was sworn in as a United States citizen on December 14, 2012.  Pet. Ex. 17.  Petitioner is a physician and was working as a medical researcher at Mount Sinai Hospital in New York.  In January 2013 she returned to India to care for an aging and ill father.  As of the time of the hearing petitioner had split her time between her father's home in India and in New York City.   There was no evidence of prior shoulder pain or dysfunction.

Petitioner testified that she experienced pain in her right shoulder shortly after receiving the flu vaccination and that "as soon as [she] reached home there was significant pain on my right shoulder."  Tr. 49.  She stated that she thought that the pain would subside, but as the evening progressed petitioner "felt a lot of heaviness and pain-which wasn't normal for other injections."  *Id.*  She applied ice on her right shoulder and took pain medication to soothe the pain.  *Id.*  Petitioner stated that the pain continued through the next day, but she thought it would go away, as some shots are more painful than others.  *Id.*  She testified that the pain would not cease.  *Id.*  By mid-December, she could not move her right arm all the way up when she went to take a shower.  Tr. 49-50.  She stated that slowly she could not comb her hair on the right side or put her arm in the right sleeve of her jacket.  Tr. 50

In late January she left for India and experiencing a lot of pain in her right shoulder.  Tr. 50.  She stated that once she reached India, she contacted Dr. Shah because her arm was "freezing."  *Id.*  She testified that between November 15, 2012, the day of the vaccination, and her first appointment with Dr. Shah on February 28, 2013, her right shoulder condition did not improve.  Tr. 51. She stated that instead, her arm was getting progressively stiffer.  *Id.* Petitioner stated that she was unable to perform day to day personal activities because she is right hand dominant.  *Id.*  She explained that even when she was at rest, she was feeling pain and her day-to-day activities were getting limited.  Tr. 54.

On February 28, 2013, petitioner sought treatment from Dr. Harsh Shah.  Tr. 38; Pet. Ex. 3 at 1.  Dr. Shah observed that that petitioner has bicipital tenderness and abduction/internal

rotation was "painfully limited."  *Id.*  Dr. Shah diagnosed petitioner with "impingement syndrome" and referred her for physical therapy the same day.  *Id.*

During petitioner's initial consult with Megha Sheth, physical therapist, it was noted that, "[Petitioner] present[ed] with severe frozen shoulder/ adhesive capsulitis of right shoulder joint. [Petitioner] first received a flu shot intramuscularly on 15 Nov 2012.  The IM injection site on right deltoid region started to hurt soon after injection on the same day.  [Petitioner] assumed that the pain was due to flu vaccination and that it would go away after some time.  Gradually, however, the right shoulder started to become significantly painful, inflamed, stiff, restrictive and weak.  The patient is right-handed and right arm is her dominant arm."  Pet. Ex. 12 at 1.  In the "current condition," section of the record, it states, "Due to severe pain, stiffness, inflammation and weakness, it is excruciatingly painful and difficult for patient to move her right arm and perform day to day activities."  *Id.*  A physical exam revealed that petitioner had normal range of motion and strength with her left shoulder but had deficits in her right shoulder active range of motion.  *Id.* at 3. The record for that visit noted that petitioner had an internal rotation of the right arm of only 28 degrees and external rotation of 25 degrees; her abduction was limited to 100 degrees and flexion limited to 110 degrees.  *Id.*  Petitioner was positive for Spurling's Test and the Empty Can Test on the right shoulder and negative on all special shoulder tests on the left shoulder.  *Id.*  It was recommended that petitioner begin physical therapy and recommended that she engage in strength exercises, moist heat therapy to increase local circulation and decrease pain and inflammation; active and passive stretching to increase joint range of motion; peripheral joint mobilization/cryotherapy which is the application of cold to decrease local swelling and decease pain.  *Id.* at 4.

Petitioner continued extensive physical therapy with Megha Sheth through July 2013. On the last day of her physical therapy with Megha Sheth, it was noted that petitioner "did not improve on the prescribed treatment she received at the center in more than 4 months."  Pet. Ex. 12 at 74.  Petitioner reported that her pain was not improving and she was going to continue further treatment when she came to the United States.  *Id.*

On July 26, 2013, petitioner had an appointment with Dr. Steven Lager.  Pet. Ex. 5 at 1. Petitioner reported "2% pain when sitting and not using her shoulder but severe pain when she was using the shoulder."  *Id.*  The physical exam showed petitioner had "extraordinarily tight right glenohumeral joint with reduced passive range of motion, tenderness in the mid-humerus below the deltoid insertion, and pain in the restricted abduction.  *Id.* Dr. Lager diagnosed petitioner severe right shoulder capsulitis, "that did not respond to 4 months of physical therapy."  *Id.*

Petitioner had a sports medicine appointment on August 8, 2013 with Dr. Darlene K. Jean-Pierre.  Pet. Ex. 2 at 38.  The clinic note states, "48 yF RHD referred to sports clinic for evaluation and treatment of R shoulder pain/stiffness s/p flu shot in 11/2012."  *Id.*  It was noted that petitioner had "diffuse tenderness to palpation" on her right upper extremity and she had a positive impingement sign.  *Id.*  Petitioner also demonstrated "some weakness with supraspinatus test."  *Id.*  Dr. Jean-Pierre diagnosed petitioner with adhesive capsulitis of shoulder and administered a subacromial/intraarticular injection.  *Id.* During the course of her therapy she also received a ten day course of Prednisone which was not helpful.

3

On August 12, 2013, petitioner had an occupational therapy shoulder evaluation. Pet. Ex. 2 at 42. It was reported that petitioner's diagnosis was "right shoulder adhesive capsulitis." *Id.* It was also noted that petitioner's dominate extremity was her "right." *Id.* The history of treatment stated, "…right shoulder pain since 11/2012 s/p flu shot, received aggressive PT in India (illegible) improvements, s/p injection subacromial region by sports on 8/8/2013." Petitioner reported that she had pain in her right shoulder in all directions at an 8/10. *Id.* She demonstrated limited range of motion in all directions. *Id.* at 43. Petitioner had her second occupational therapy appointment on August 16, 2013. *Id.* at 46. She reported "much improved pain" in the right shoulder, indicating that it was a 2/10 while at rest. *Id.* Petitioner had three other occupational therapy appointments in August 2013. *Id.* at 47-9. At the August 29, 2013 visit, petitioner reported that she was traveling for two weeks. *Id.* at 49. Petitioner returned to occupational therapy on October 4, 2013. *Id.* at 51. She reported reduced pain in her right shoulder and that she had been compliant with home treatments as much as possible. *Id.* She had another occupational therapy appointment on October 11, 2013. *Id.* at 52. At this appointment, she reported her pain as a 1/10. *Id.*

On April 15, 2014, petitioner presented to Performance Rehabilitation for an initial evaluation. Pet. Ex. 7 at 1. It was recorded that petitioner received a flu vaccination in November 2012 and that she developed frozen shoulder. *Id.* at 1. During the initial physical therapy evaluation, petitioner demonstrated reduced range of motion of her right shoulder on active movement. *Id.* Petitioner had a positive drop arm test, positive impingement test and positive Spurling test. *Id.* Petitioner was assessed with right frozen shoulder with secondary bicipital tendinitis and some symptoms consistent with cervical radiculopathy. *Id.* Petitioner had physical therapy appointments at Performance Rehabilitation for the next six weeks. Pet. Ex. 7. At an appointment on May 13, 2014, petitioner reported that her shoulder was "getting better little at a time," and that her pain had been reduced. *Id.* at 18. On May 22, 2014, petitioner reported a "significant reduction in pain and improved [range of motion], strength and mobility," however, petitioner continued to report "difficulty and limitations in her ability to lift and reach overhead, behind her back and still has pain with activity." *Id.* at 22. She reported her pain at a 1/10 at best and a 5/10 at worst. *Id.* On June 4, 2014, at another physical therapy appointment, petitioner reported that "her shoulder is significantly better. She feels her range is a lot looser and is able to reach behind her back better." *Id.* at 28. Later in the month, on June 9, 2014, petitioner reported, "…significant range improvements day to day. Much easier reaching behind [her] back. Pain only with reaching across body." *Id.* at 32.

Petitioner had a follow-up appointment with Dr. Wanich on June 12, 2014. Pet. Ex. 8 at 1. In the history, he noted that petitioner "has demonstrated improvement with physical therapy." *Id.* After a physical exam of her right shoulder, he assessed petitioner with right shoulder adhesive capsulitis. *Id.* at 4. He wrote that petitioner had responded well to physical therapy, but "still lacks [internal rotation/external rotation]," and he gave her a new physical therapy referral. *Id.*

When petitioner returned to India in December 2014, she re-established physical therapy care at the Institute for Physical Medicine. Her history at that time noted that petitioner had aggressive physical therapy from February to July 2013 in India and again in the U.S. *Id.*

4

Petitioner reported that the pain was at worst a 3/10 and at rest a 0-1/10.  *Id.*  She reported mild limitation when trying to lift objects and mild to difficult when trying to reach overhead.  *Id.*  A physical examination of the shoulder revealed some limitation on external rotation and internal rotation, along with decreased strength (4/5) on the right shoulder compared to the left shoulder.  *Id.* at 3.  Physical Therapist Komal Patel assessed petitioner, noting, "Signs and symptoms are consistent with residual right frozen shoulder with bicipital tendinitis.  Signs and symptoms are also consistent with cervical radiculopathy.  *Id.*  It was recommended petitioner engage in physical therapy for the right shoulder, including strengthening and stabilizing exercises, as well as, certain passive movements to improve range of motion.  *Id.*  Petitioner had physical therapy appointments from December 10, 2014 to April 28, 2017 in India.  *See* Pet. Exs. 13, 18, and 25.

On September 29, 2016, petitioner had an MRI of her right shoulder at InFocus Diagnostics in Ahmedabad, India.  Pet. Ex. 16.  The MRI revealed a thin strip of fluid in the subacromial subdeltoid bursa with heterogeneous content and capsular thickening, mild effusion in the acromioclavicular joint with capsular fullness, degenerative signal changes in the antero-superior glenoid labrum and mild edematous changes in the rotator cuff interval space (mild changes of adhesive capsulitis).  *Id.*  The impression of the MRI was tendinosis involving anterior fibers of supraspinatus tendon, changes of subacromial subdeltoid bursitis and mild effusion involving AC joint with capsular fullness.  *Id.*

By August 2017, petitioner stated that she had a dull, continuous aching pain and some sleep disturbances, but that were "not as severe as in 2013 or 2014."  Tr. 120.  She felt she reached a plateau of residual problems and needed a break from physical therapy.  *Id.*  In December 2017, she was "feeling much better," but still experienced some pain reaching behind her back and overhead, which she considered "normal."  *Id.*

On May 4, 2018, petitioner had another appointment with Dr. Gregory DiFelice.  Pet. Ex. 27. In petitioner's history, it was noted that she was right hand dominant who has had right shoulder pain and stiffness "for several years after receiving the flu shot."  *Id.* at 1.  Dr. DiFelice performed a focused physical exam of the right shoulder which showed active forward flexion 1-160 degrees, abduction was 1-160 degrees, external rotation was 0-60 degrees and active internal rotation to T12, all with good kinematics.  Petitioner's strength was 5/5 in the plane of the scapula; 5-/5 in external rotation; and 5-/5 in subscapula.  *Id.* at 2.  She had a negative Spurling's test, but positive impingement signs.  *Id.*  Dr. DiFelice diagnosed petitioner with chronic rotator cuff syndrome, possibly related to flu shot.  *Id.*  He recommended petitioner continue at home exercises, ice and over-the-counter NSAIDs and Tylenol as needed for pain control.  *Id.*

Petitioner testified that "some background pain is always there."  Tr. 121.  She explained that "during good seasons, when I don't overstretch or overwork [her] arm," she feels good about her movements, sleep and activities.  Tr. 121.  But during the monsoon season or colder months, her pain would come back.  *Id.*  She testified that by March 2018, she reported to her physical therapist that she had pain in her right shoulder, but had improvement in movement since the wintertime.  Tr. 124.  She stated that since March 2018, her shoulder issues had remained stable and she had been feeling much more comfortable sleeping and in her movements.  Tr. 125.

5

Petitioner described a variety of activities that can aggravate her right shoulder, including vacuuming, carrying more than six pounds in her right hand, or carrying a large bag. Tr. 130-31. She stated that she purchased a specialized cart to assist her with grocery shopping. Tr. 133. During the hearing, petitioner demonstrated her range of motion in her right shoulder. Tr. 136. During the hearing, she was able raise her left arm about 180 degrees (normal)but her right arm only to 150 degrees. *Id.* When asked about reaching behind her back, she was able to get to about the T-5 level (normal) with the left arm but only to the T-12 level with the right. Tr 135. She testified that all of the treating physicians she has seen for her right shoulder told her she would experience residual problems with her right shoulder forever. Tr. 146.

### IV. Contentions of the Parties

#### A. Petitioner's Position

Petitioner proposes an award of $250,000 for past pain and suffering, the most allowed for pain and suffering cases in the Vaccine program under the statutory cap. Pet. Post-Hearing Brief at 17. Petitioner contends that her "life is now a life of pain, with severely limited use of her right dominate arm." Pet. Post-Hearing Brief at 18. She argues that her injury is a "severe and permanent injury, which impacts all aspects [of her life]." *Id.* Petitioner stated in her post-hearing brief that "she wakes up to pain…lives with pain during the day and she goes to sleep with pain, which wakes her up at during the night." *Id.* at 19. This "constant 'background' pain' justifies her being awarded the maximum amount of that can be awarded for pain and suffering in the vaccine program of $250,000. *Id.* at 18-19.

Petitioner cites to *Graves v. Sec'y of Health & Human Servs* to support an award of $250,000 in pain and suffering. Petitioner stated that *Graves*, "instructed that pain and suffering awards should be considered in light of the overarching purpose of the Vaccine Act to award compensation." Pet. Post-Hearing Brief at 18; *see also Graves v. Sec'y of Health & Human Servs.,* 109 Fed. Cl. 579, 595 (2013). Petitioner stated that the, "The Court in *Graves,* observed numerous cases in which pain and suffering had been experienced even for short durations of time, but yet had garnered awards far exceeding the statutory cap." Pet. Post-Hearing Brief at 18.

Petitioner then argues that if petitioner's past pain and suffering did not reach the $250,000 cap, then she should be awarded future pain and suffering for years until the future, until the statutory cap is reached. Pet. Post-Hearing Brief at 19. She stated that, "through an economist, reduce the future award to its net present value, pursuant to the Federal Circuit's holding in *Youngblood.*" *Id.; Youngblood v. Sec'y of Health & Human Servs.,* 32 F. 3d. 552, 555 (Fed. Cir. 1994).

Petitioner also requests reimbursement for out-of-pocket expenses totaling $1,772.62; one physical therapy appointment per week until 2029, totaling $3,050.32; and future care items identified in the life-care plan. Pet. Post-Hearing Brief at 20-27.

#### B. Respondent's Position

Respondent argued that petitioner's ongoing left shoulder injury is rotator cuff syndrome, which was the result of a natural aging process and is a separate injury from petitioner's initial adhesive capsulitis.  Resp. Post-Hearing Brief at 17.  As noted in the entitlement decision, I did not find that petitioner's rotator cuff syndrome was a separate injury, but instead likely a sequalae of her SIRVA.

Respondent argues that, "Special Masters have awarded comparatively less severely injured petitioners comparatively less in pain and suffering." *Id.* at 18.  Respondent cites to *Hocraffer,* where former Chief Special Master Golkiewicz stated, "to fairly treat all petitioners, the Special Masters have attempted to create a continuum of injury, awarding the highest pain and suffering to the most injured and reducing the pain and suffering for lessor injuries."  Resp. Post-Hearing Brief at 18; *Hocraffer v. Sec'y of Health & Human Servs.,* No. 99-533V, 2007 WL 914914 at *5 (Fed. Cl. Spec. Mstr. Feb. 28, 2007).  Respondent also agreed with the approach set forth in *Graves,* stating, "The Court in *Graves* set forth its own approach, whereby a special master would first determine the amount of pain and suffering damages, without regard to the $250,000 cap.  Then, if necessary, the special master would apply the statutory cap…Respondent agrees with *Graves* to the extent it calls for an individualized assessment of damages based on the specific facts of petitioner's case." *Id.* at 18.; *Graves,* 32 F. 3d, 589-90.

Respondent then argues that the plain text of the statute limiting actual and projected pain and suffering and emotional distress to $250,000, "contemplates that at least *some* petitioners would be awarded less than the statutory maximum." Resp. Post-Hearing Brief at 19.  Respondent stated that he approached the valuation of pain and suffering in this case by examining the individual aspects of petitioner's case, including degree of injury, the duration, and the extent of any disability alongside a general aim that seeks to compensate similarly situated claimants justly, in a similar way.  *Id.*  Respondent stated that petitioner reports her daily pain is a 1 to 1.5 out of 10; she was found to have normal range of motion and pain consistent with rotator cuff syndrome; and she is volunteering as a pediatrician at a local clinic in India three to four days per week.  *Id.* at 20.  Respondent acknowledged that petitioner had a steroid injection but pointed out that she did not have arthroscopic surgery, and thus should be awarded $75,000.00 for pain and suffering.  *Id.* at 20.

### V. Discussion

#### 1. Petitioner's Pain and Suffering

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment award such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Human Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

7

There is no mathematical formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Human Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Human Servs.*, No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

A special master may also consider prior pain and suffering awards to aid the resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Human Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). A special master may rely on my own experience adjudicating similar claims. *Hodges v. Sec'y of Health & Human Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).

In *Graves*, Judge Merow rejected the special master's approach of awarding compensation for pain and suffering based on a spectrum from $0.00 to the statutory cap of $250,000. *Graves v. Sec'y of Health and Human Servs.*, 109 Fed. Cl. 579, 590 (2013). The Court noted that this constituted "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." *Id.* at 590. Instead, the Court assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside the Vaccine Program. *Id.* at 595.

In that regard, the Special Processing Unit ("SPU") has amassed a significant history regarding damages in SIRVA cases. In *Vinocur v. Secretary of Health & Human Services*, Special Master Dorsey explained that after five-and-one-half years of SPU, 1,405 SIRVA cases were resolved informally as of January 1, 2020. *Vinocur v. Sec'y of Health & Human Servs.*, No. 17-598V, 2020 WL 1161173, at *9 (Fed. Cl. Spec. Mstr. Jan. 31, 2020). Special Master Dorsey noted that the median award for cases resolved via government proffer was $95,000.00 and the median award for cases resolved via stipulation was $70,000.00.[3] The history of

---

[3] The total range for all informally resolved SIRVA claims—by proffer or stipulation—spans from $25,000.00 to $1,845,047.00. *Id.* at *9 n.13. Importantly, these amounts represent total compensation and typically do not separately list amounts intended to compensate for lost wages or expenses. The undersigned notes that these figures represent five-and-one-half years' worth of *past* informal resolution of SIRVA claims and represent the bulk of prior SIRVA experience in the Vaccine Program. However, these figures are subject to change as additional cases resolve and do not dictate the result in this or any future case. Nor do they dictate the amount of any future proffer or settlement.

8

informal resolution in SPU "reflects a substantial history of resolutions among many different cases with many different counsel," and thus, "the undersigned is persuaded that the full SPU history of settlement and proffer conveys a better sense of the overall arms-length evaluation of the monetary value of pain and suffering in a typical SIRVA case." *Kim v. Sec'y of Health & Human Servs.,* No. 17-418V, 2018 WL 3991022, at *9 (Fed. Cl. Spec. Mstr. July 20, 2018). *Schnoonover supra.*

In addition to recounting the awards in proffered and stipulated cases, former Chief Special Master Dorsey has also written numerous reasoned decisions awarding damages in SIRVA cases which include detailed information regarding the basis for the awards.[4] Typically, the primary point of dispute between the parties is the appropriate amount of compensation for pain and suffering.

### a. Petitioner's Past Pain and Suffering

I have carefully reviewed the testimony, medical records, expert opinions and the parties briefs in this case. Upon review of the complete record and in consideration of damages awarded in other SIRVA cases, as well as my own knowledge and experience in evaluating SIRVA claims, I find that an award of $125,000.00 for past pain and suffering to be reasonable.

Petitioner testified credibly that she initially experienced a severe SIRVA, followed by months of excruciating pain. Petitioner testified that she experienced pain in her right shoulder the same evening she received the flu vaccination. The pain continued, along with a restricted range of motion gradually increasing over the ensuing months. Petitioner explained she did not seek immediate medical treatment because she believed the pain would go away. When she finally sought treatment in late February 2013, she was in considerable pain and had a significant reduction in the range of motion in her right shoulder.

The petitioner underwent extensive physical therapy, multiple times a week, for a period of five years following the vaccination. The physical therapy in this case is the primary measure of treatment and persistent nature of the pain and suffering in this case. Petitioner filed six

---

[4] *Reed v. Sec'y of Health & Hum. Servs.,* No. 16-1670V, 2019 WL 1222925 (Fed. Cl. Spec. Mstr. Feb. 1, 2019); *Attig v. Sec'y of Health & Hum. Servs.,* No. 17-1029V, 2019 WL 1749405 (Fed. Cl. Spec. Mstr. Feb. 19, 2019); *Binette v. Sec'y of Health & Hum. Servs.,* No. 16-0731V, 2019 WL 1552620 (Fed. Cl. Spec. Mstr. Mar. 20, 2019); Hooper, 2019 WL 1561519; *Garrett v. Sec'y of Health & Hum. Servs.*, No. 18-0490V, 2019 WL 2462953 (Fed. Cl. Spec. Mstr. Apr. 8, 2019); *Weber v. Sec'y of Health & Hum. Servs.*, No. 17-0399V, 2019 WL 2521540 (Fed. Cl. Spec. Mstr. Apr. 9, 2019); *Bordelon v. Sec'y of Health & Hum. Servs.,* No. 17-1892V, 2019 WL 2385896 (Fed. Cl. Spec. Mstr. Apr. 24, 2019); *Pruett v. Sec'y of Health & Hum. Servs.,* No. 17-0561V, 2019 WL 3297083 (Fed. Cl. Spec. Mstr. Apr. 30, 2019); *Bruegging v. Sec'y of Health & Hum. Servs.,* No. 17-0261V, 2019 WL 2620957 (Fed. Cl. Spec. Mstr. May 13, 2019); *Wallace v. Sec'y of Health & Hum. Servs.,* No. 16-1472V, 2019 WL 4458393 (Fed. Cl. Spec. Mstr. June 27, 2019); *Schandel v. Sec'y of Health & Hum. Servs.,* No. 16-0225V, 2019 WL 5260368 (Fed. Cl. Spec. Mstr. July 8, 2019); *Capasso v. Sec'y of Health & Hum. Servs.*, No. 17-0014V, 2019 WL 5290524 (Fed. Cl. Spec. Mstr. July 10, 2019); *Kelley v. Sec'y of Health & Hum. Servs.,* No. 17-2054V, 2019 WL 5555648 (Fed. Cl. Spec. Mstr. Aug. 2, 2019); *Kent v. Sec'y of Health & Hum. Servs.,* No. 17-0073V, 2019 WL 5579493 (Fed. Cl. Spec. Mstr. Aug. 7, 2019); *Lucarelli v. Sec'y of Health & Hum. Servs.,* No. 16-1721V, 2019 WL 5889235 (Fed. Cl. Spec. Mstr. Aug. 21, 2019); *Goring v. Sec'y of Health & Hum. Servs.,* No. 16-1458V, 2019 WL 6049009 (Fed. Cl. Spec. Mstr. Aug. 23, 2019); *Nute v. Sec'y of Health & Hum. Servs.,* No. 18-0140V, 2019 WL 6125008 (Fed. Cl. Spec. Mstr. Sept. 6, 2019).

separate exhibits containing physical therapy treatment records. *See* Pet. Exs. 7, 12, 13, 18, 25 and 31. The treatments began shortly after she saw the orthopedist, Dr. Shah, in late February 2013. At the end of her first round of physical therapy in July 2013, petitioner reported no improvement in reduction of pain or shoulder mobility. Pet. Ex. 12 at 74. Her physical therapist noted that petitioner's shoulder condition "significantly impairs her social/professional/personal and recreational life." *Id.* When petitioner returned to the U.S., she had an appointment at the Jacobi Medical Center Orthopedic Clinic on August 8, 2013. Pet. Ex. 2 at 38. Petitioner reported that she underwent aggressive physical therapy without significant improvement. *Id.* At this appointment, petitioner received her only steroid injection. *Id.*

Petitioner continued with physical therapy until October 2013. Pet. Ex. 2 at 42-52. At her initial appointment on August 12, 2013, she reported her pain at an 8 out of 10. *Id.* at 42. Her active external rotation was listed 35 degrees and her abduction was recorded at 90 degrees. *Id.* at 44. At an appointment on December 26, 2013, petitioner reported that she had some improvement in right shoulder pain after the physical therapy. *Id.* at 61.

On April 10, 2014, petitioner was still experiencing pain in her right shoulder and sought treatment from orthopedist, Dr. Tony Wanich. Pet. Ex. 6. She reported her pain to be at a 4 out of 10. *Id.* at 1. After a targeted right shoulder exam, where petitioner demonstrated an external rotation of 50 degrees; abduction of 140 degrees; external rotation to 60 degrees and internal rotation to her mid-lumbar spine, Dr. Wanich diagnosed petitioner with adhesive capsulitis and recommended she continue to work with physical therapy. *Id.* at 4.

Petitioner pursued a very extensive course of physical therapy over a period of approximately 3.5 years and continues to consistently do a course of home exercises as prescribed by her physicians. In total, over the course of five years, petitioner had nearly 400 physical therapy appointments. *See* Pet. Exs. 2, 7, 12, 13, 18, 25 and 31.

The records of physical therapy indicated treatments exclusively focused on the right shoulder for adhesive capsulitis, tendinitis and bursitis. The records suggested some level of waxing and waning in her pain, but never resolution and generally indicated goals of reducing pain and increasing range of motion. An example of the documentation of her pain on September 23, 2016 by the Bhatt Institute of Physiotherapy therapist said, "There is constant heavy, sore pain from inside out of her right shoulder joint. Pain is exacerbated by humid and cold weather. The weakness, residual stiffness and restriction of movement make her feel uncomfortable. She feels less than normal in her daily activities. Pet. Ex. 18 at 72. The records also consistently indicated that she was compliant with home exercise programs between visits.

When petitioner had an appointment with Dr. DiFelice in May 2018, he diagnosed her with right chronic rotator cuff syndrome, "[possibly] related to flu shot," and recommended a continued home exercise program. Pet. Ex. 27 at 2. At the last recorded physical therapy appointment in June 2018, petitioner was reporting her pain at a 2-3 out of ten at its worst and some pain in the right shoulder while sleeping. Pet. Ex. 31 at 64. Her external rotation was noted as "within normal limits," but "with moderate pain." *Id.*

10

An award of $125,000.00 in past pain and suffering is consistent with other SIRVA awards where petitioners have had no surgical intervention but had steroid injections and numerous physical therapy sessions. For example, in *Cooper,* former Chief Special Master Dorsey awarded $110,000.00 in pain and suffering due to the petitioner experiencing eight months of severe or significant pain following the SIRVA, followed by a longer period of residual pain and reduced range of motion, with no surgical intervention *Cooper v. Sec'y of Health & Human Serv.,* No. 16-138V, 2019 WL 6288181*12 (Fed. Cl. Spec. Mstr. Nov. 7, 2018). In another SIRVA damages decision, former Chief Special Master Dorsey awarded $130,000.00 in past pain and suffering to a petitioner who experienced moderate to severe pain for two years after the vaccination and did not have a surgical intervention. *Binette v. Sec'y of Health & Human Servs.,* No. 16-731, 2019 WL 1552620 (Fed. Cl. Spec. Mstr. July 8, 2019).

Upon consideration of petitioner's description of the pain and suffering, including restricted motion in her arm which she endured and the lesser amount of pain that she continues to endure, together the record of very extensive physical therapy, a course of prednisone, a steroid injection and the medical records denoting her condition at various times and the progress that she has made, I have determined that an award for pain and suffering of $125,000 is appropriate.

### b.  Petitioner's Future Pain and Suffering

During the hearing, petitioner testified that she continues to suffer from the effects of her injury. She explained she continues to experience some pain and limitation of motion, which together, affect her activities of daily living. She stated that she continues to use over the counter pain medication when necessary and engages in a home exercise program, however, she still has some reduction in range of motion. She also has been able to work several days a week as a volunteer pediatrician in India. Petitioner testified that she does continue to have residual pain in her right shoulder, particularly in cold and damp weather. While recognizing petitioner has achieved considerable improvement from the early post-vaccination time period, I find that she has demonstrated that she has permanent residual injury that justifies an award of future of pain of suffering of $1,000.00 per year for her life expectancy of 30 years based on her birthdate.

There are several reasoned SIRVA damages decisions where compensation for future pain and suffering have been awarded. *See Dhanoa v. Sec'y of Health & Human Servs.,* No. 15-1011V, 2018 WL 1221922; *Binette v. Sec'y of Health & Human Servs.,* No. 16-731, 2019 WL 1552620; and *Curri v. Sec'y of Health & Human Servs.,* No. 17-432, 2018 WL 6273562 (Fed. Cl. Spec. Mstr. Oct. 31, 2018). In these cases, former Chief Special Master Dorsey, who oversaw the SPU and developed a considerable base knowledge of awards, considered the typical signs and symptoms of the injury, the treatment of the injury (surgical intervention, physical therapy, steroid injections), the length of treatment, and the persistence of symptoms and limitations in range of motion.

Petitioner cited to *Anthony* and *Schettl* to support her position that she should receive the full $250,000.00 award for pain and suffering. Pet. Post-Hearing Reply at 4. However, unlike in the present case, the petitioner in *Anthony* had surgical intervention for his post-vaccination shoulder injury. *See Anthony v. Sec'y of Health & Human Servs.,* No. 14-680, 2016 WL

11

7733084 at *1 (Fed. Cl. Spec. Mstr. Dec. 15, 2016). The *Schettl* case involves a complex regional pain syndrome ("CRPS") injury post flu vaccination, where petitioner was diagnosed with "severe intractable neuropathic pain." *Schettl v. Sec'y of Health & Human Servs.,* No. 14-422, 2019 WL 664493 at *10 (Fed. Cl. Spec. Mstr. Jan. 22, 2019).

While no case is identical on the facts, this case falls between the *Dhanoa* and *Binette* cases but closer to *Binette*. Both *Dhanoa* and *Binette* are SIRVA cases. Former Chief Special Master Dorsey found that the petitioner in *Dhanoa* obtained significant relief from two steroid injections and ten physical therapy appointments, but she still experienced intermittent pain and a slight decrease in range of motion and awarded her $10,000.00 in future pain and suffering for one year (reduced to net present value). *Dhanoa* at *6-7. In *Binette,* former Chief Special Master Dorsey awarded the petitioner $1,000.00 per year for her life expectancy of 57 years for future pain and suffering, finding that petitioner's injury was permanent and continued pain and reduction in range of motion. *Binette* at *13-14. The petitioner in *Binette* described constant pain and disruption to her sleep due to pain; had improvement from physical therapy but did not regain all mobility in her shoulder; and had temporary relief from steroid injections. *Binette* at *6-8.

Here, petitioner's injury was to her *dominant* arm, which required her to compensate for certain activities of daily living; she complained of sleep disruption due to pain; and despite the nearly 400 physical therapy appointments, she still has limitations in mobility due to pain and stiffness in her right shoulder. However, petitioner has also explained that she has made great progress in improving her range of motion and reducing the pain from when the injury first occurred, therefore, the record does not support the amount of future damages petitioner seeks. Nevertheless, I find that it is likely that petitioner will have permanent residual pain and impairment but at a level much improved from that which she experienced in the months following the vaccination.

Petitioner bears the burden of proof with respect to each element of compensation requested and the medical records are the most reliable evidence of petitioner's condition. *Brewer v. Sec'y of Health & Human Servs.,* No. 93-92V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996); *Shapiro v. Sec'y of Health & Hum. Servs.,* 101 Fed. Cl. 532, 537-38 (2011). Based on petitioner's medical records and testimony, the undersigned finds that an award of $1,000.00 per year for her life expectancy of thirty (30) years[5] is an appropriate award for petitioner's future pain and suffering. This amount will be reduced to net present value, discussed below.

### 2. Future Unreimbursed Expenses

Both petitioner and respondent obtained life care planners to consider future unreimbursed expenses. Future unreimbursed expense may be paid when they are "reasonably necessary." §15(a)(1)(A)(iii)(II). Future unreimbursed expenses should be awarded to a degree "beyond that which is required to meet the basic needs of the injured person…but short of that

---

[5] Petitioner's life expectancy was calculated using the tables compiled by the National Center for Health Statistics. Elizabeth Arias & Jiaquan Xu, *United States Life Tables, 2017*, 68 National Vital Statics Reports (2019). https://www.cdc.gov/nchs/fastats/life-expectancy.htm (accessed on Aug. 8, 2020).

which may be required to optimize the injured person's quality of life. *Curri* at *4 (citing *Scheinfield v. Sec'y of Health & Human Servs.,* No. 90-212V, 1991 WL 94360, at *2 (Cl. Ct. Spec. Mstr. May 20, 1991).

Petitioner requested future unreimbursed expenses for physical therapy and medical evaluations; pain relief; housekeeping; and items to improve activities of daily living. Pet. Post-Hearing Brief at 21-2. Both petitioner and respondent retained life care planners and submitted life care plans. Pet. Ex. 30; Resp. Ex. C.

Petitioner requested $3,050.32 per year for future physical therapy once a week until 2029. Petitioner stated that the cost of a physical therapy appointment in India is $7.00 per visit and $58.66 in the United States (with insurance offsets). Pet. Post-Hearing Brief at 27. Petitioner testified credibly that her shoulder mobility has not returned to baseline and that her treating physicians stressed the importance of continuing stretching and exercises regimes to maintain mobility. Tr. 202. Additionally, the medical records demonstrate that when petitioner engaged in physical therapy, her shoulder mobility and strength increased. Therefore, I find petitioner's requested award of one physical therapy session per week until 2029 reasonably necessary. However, given the amount of time petitioner spent in India and continues to spend in India, I will award petitioner $1,820.00 for five years to cover the costs of one physical therapy session per week at the rate of $7.00 per session in India and $15,251.60 for five years to cover the costs of one physical therapy session per week at the U.S. rate of $58.66 per session.

Petitioner also requested $400 per year for life for physical therapy evaluations for life and orthopedic evaluations per year until age 65. Given that petitioner will continue with ongoing physical therapy, one physical therapy evaluation per year until 2029 is reasonably necessary. Petitioner shall be awarded $2000.00 for an annual physical therapy evaluation ($200.00 per visit for ten years). Further, during the course of hearing, I granted petitioner's request for an award covering the cost of orthopedic evaluations, finding these evaluations to be reasonably necessary. Tr. 234-35. I granted petitioner $114.00 for the first two years to cover the costs of an orthopedic evaluation in India (at $57.00 per evaluation in India) and $350.00 per year for the next eight years for annual evaluations in the United States. *Id.*

In addition to ongoing physical therapy, petitioner requested an award to cover pain relief expenses, including over-the-counter topical creams, over-the-counter pain patches and acetaminophen. Pet. Post-Hearing Brief at 21. After reviewing the life care plans developed by each party, I stated during the hearing that I will grant petitioner's request for these items and the amounts awarded will be to cover her lifetime expenses, not per year. As such, I found the following reasonably necessary future expenses: $1,860.00 for topical creams; $1,170.00 for pain patches; and $2,490.00 for acetaminophen. Tr. 235.

Additionally, petitioner identified personal support expenses, including a shoulder pulley, Tempur-pedic pillow, specialized bra, portable shopping cart with wheels and home assistance services. Petitioner testified that she continued to have some issues reaching behind her back and lifting items over five pounds. Tr. 129. After reviewing the life care plans submitted by both parties, I found the following personal support expenses to be reasonably necessary: $825.00 for Tempur-Pedic pillows ($55.00, replaced every two years for life); $750.00 for a

specialized adaptive grocery cart ($125.00 per cart, replaced every five years for life); and $570.00 for a specialized device designed to aid women with limited mobility in an arm to put on a bra (at $38.00 per device, replaced every two years). Tr. 235-45.

Petitioner requested separate amounts for housekeeping and assistive services. Pet. Ex. 30. The life care plan submitted by respondent provides $1,037.40 for assistive services, including grocery shopping, laundry, and food delivery. Resp. Ex. C at 4. During the hearing, I stated that respondent's position was reasonable. Tr. 235. Additionally, I stated that I would award this amount for petitioner's life expectancy. Tr. 245. As such, petitioner is awarded, $1,037.40 per year for thirty years for assistive services.

Petitioner requested that a growth rate of 4% be applied to the life care damages. Pet. Post-Hearing Brief at 22; Tr. 241. During the hearing, respondent requested a growth rate of 3%. Tr. 242. At the time of hearing I indicated that I would order a 4% rate but after further review and consideration of petitioner's future needs and that most of the items awarded under the life care plan are consumer items I will instead order a rate of 3% which is more consistent with the rate of inflation.

In accordance with the above, below is a table that summarizes petitioner's unreimbursed future expenses:

| Items of Compensation | Duration | Total Amount |
|---|---|---|
| Physical Therapy | 10 yrs. | $17,071.60 |
| Ortho. Evaluation | 10 yrs. | $3,028.00 |
| Physical Therapist Eval. | 10 yrs. | $2,000.00 |
| Pain Relief Medications | Lifetime | $5,520.00 |
| Tempur-Pedic Pillow | Lifetime | $825.00 |
| Adaptive Grocery Cart | Lifetime | $750.00 |
| Buckingham Bra Angel | Lifetime | $570.00 |
| Assistive Services | Lifetime | $31,122.00 |
| **Total** | | **$60,886.60** |

3. Reduction to Net Present Value

Section 15(f)(4)(A) requires that future compensation awards to be reduced to their net present value. Reducing future elements of compensation to net present value generally entails awarding a lump sum that, if prudently invested, will provide petitioner with an amount equivalent to [her] future damages. *Brown v. Sec'y of Health & Human Servs.,* No. 00-0182, 2005 WL 2659073, at *2 (Fed. Cl. Spec. Mstr. Sept. 21, 2005); *see also Petronelli v. Sec'y of Health & Human Servs.,* No 12-285, 2016 WL 3252082 (Fed. Cl. Spec. Mstr. May 12, 2016).

The Supreme Court noted that in almost any case, calculating the loss of future wages could become the subject of reasonable debate. *See Monessen Southwestern Railway Co. v.*

*Morgan*, 486 U.S. 330, 351 (1988). The Court counseled against allowing the average personal injury trial to become a graduate seminar on economic forecasting. *Id.* at 341. After reviewing the advantages and disadvantages of the various calculation methods, the Court in *Jones & Laughlin Steel Corp* found the "economic evidence distinctly inconclusive" and concluded that: "we do not believe a trial court adopting such an approach in a suit . . . should be reversed if it adopts a rate between one and three percent and explains its choice." *Jones & Laughlin Steel*, 462 U.S. at 548-49.

There are numerous Vaccine cases where special masters have analyzed the appropriate net discount rate to apply to future damages. *See Childers v. Sec'y of Health & Human Servs,* No. 96-194V, 1999 WL 218893 (Fed. Cl. Spec. Mstr. Mar. 26, 1999); *Petronelli v. Sec'y of Health & Human Servs.,* 2106 WL 3252082 (Fed. Cl. Spec. Mstr. May 12, 2016); *Brown,* 2005 WL 2659073; *Curri,* 2018 WL 6273562; *Neiman v. Sec'y of Health & Human Servs.,* No 15-631V, 2016 WL 7741742 at *1 (Fed. Cl. Spec. Mstr. Oct 31, 2016); *Schoover v. Sec'y of Health & Human Servs.,* No. 16-1324 (Fed. Cl. Spec. Mstr. filed Aug. 5, 2020).

I considered that the challenge for petitioner is to be able to take a lump sum of money awarded to her at this time and purchase a portfolio of U.S. Treasury bonds that would provide her with a return sufficient to offset a reduction to present value. Consulting the official site of the U.S. Department of Treasury on August 7, 2020, I found that the rate of interest on a six-month treasury bond is 0.11%. The rate for a one-year bond is 0.14%, for a 2 year note 0.17%, for a 5-year bond it is 0.21 %, for a 10-year bond 0.55% % and for a 30 year note 1.20 %.[6] Obviously, the ability to obtain even a 1% return at the present time in any of the shorter maturities is non-existent. Given the low interest rates of the present day but that it is likely that rates will be at least somewhat higher in the out years of the thirty-year future damage award in this case, I am adopting a multipronged approach, as I did in *Petronelli* and as adopted by other special masters in this program. *See Curri * 5* (citing *Neiman,* 2016 WL 7741742), and *Schoonover* at n.11. Consistent with the other rulings within the Vaccine program and well within the 1% to 3% standard suggested by the Supreme Court in *Jones v. Laughlin,* I am ordering that the reduction to present value be calculated at a rate of 1% to the first 15-years of petitioner's future damages and a net-discount rate of 2% in the remaining years.

### 4. Past Unreimbursed Expenses

A Vaccine program claimant may recover past unreimbursed vaccine-related expenses which are found to be "reasonably necessary." §15(a)(1)(B). This category may include *inter alia,* costs related to medical care, therapy, special equipment and travel. *Id.* Petitioners bear the burden of showing that their requested costs are reasonably necessary. *Brewer,* 1996 WL 147722, at * 13.

Petitioner requests $1,772.62 for past unreimbursed expenses. Pet. Ex. 36. Petitioner is requesting reimbursement for physical therapy in the United States and in India; a specialized adaptive grocery cart; specialized therapy equipment and medical visits. *Id.* Petitioner provided receipts for the items requested as well. As such, I found that these costs were reasonably

---

[6] Daily Treasury Yield Curves, https://www.treasury.gov/resource-center/data-chart-center/interest-rates/pages/textview.aspx?data=yield

necessary and awarded petitioner $1,772.62 in past unreimbursed vaccine-related expenses. Tr. 242.

## VII. SUMMARY

After a review of the record as a whole, I find that petitioner should be awarded $125,000.00 in compensation for actual pain and suffering; $1,000.00 per year for her life expectancy for future pain and suffering; $60,886.60 in future unreimbursed future expenses; and $1,772.62 in past unreimbursed expenses. All future damages are reduced to present net value in accordance with the above.

The parties are to file a joint status report within thirty (30) day converting the undersigned's award of future pain and suffering and future unreimbursed expenses to the net value in accordance with the above. A damages decision will be issued following the status report.

**IT IS SO ORDERED**

<u>**s/Thomas L. Gowen**</u>
Thomas L. Gowen
Special Master.